Susan ALBISTON, et al.,
Plaintiffs, Appellees,

v.

MAINE COMMISSIONER OF HUMAN
SERVICES, et al., Defendants,
Appellants.

No. 93–1137.

United States Court of Appeals,
First Circuit.

Heard June 10, 1993.

Decided Sept. 27, 1993.

Christopher C. Leighton, Deputy Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., and Thomas D. Warren, Deputy Atty. Gen., Augusta, ME, were on brief for defendants, appellants.

Mary T. Henderson with whom Patrick Ende, Linda Christ, and Pine Tree Legal Assistance, Augusta, ME were on brief, for plaintiffs, appellees.

Before SELYA, CYR and BOUDIN, Circuit Judges.

CYR, Circuit Judge.

Plaintiffs-appellees Susan Albiston and Anita Wingert brought a class action, under 42 U.S.C. § 1983, to compel timely disbursement of "pass-through" and "gap" payments under Titles IV-A and IV-D of the Social Security Act. Defendants-appellants, in their official capacities,[1] challenged plaintiffs'

---

1. The nominal defendants are the Commissioner of the Maine Department of Human Services, 22 M.R.S.A. § 3781, and the Commissioner of the Maine Department of Finance, 5 M.R.S.A. §§ 282–283, 1541. Since the State of Maine is the real party in interest, however, we refer to defendants-appellants collectively as the "State,"

standing. The district court rejected the challenge. We affirm.

## I

### BACKGROUND

Title IV–A of the Social Security Act, 42 U.S.C. § 601 *et seq.*, creates a voluntary, cooperative federal-state program for Aid to Families With Dependent Children ("AFDC"). The AFDC program, administered by participating states, provides federal financial assistance to needy families with children who are deprived of parental support through death, disability or desertion. States are not required to participate in the AFDC program, but must agree to administer it in accordance with a federally approved AFDC plan if they elect to participate. *King v. Smith,* 392 U.S. 309, 316, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968).

In 1975, Congress amended Title IV–A, by requiring AFDC recipients to assign to the State their "rights to support from any other person" (including the right to child-support payments from an absent parent), as a condition to their receipt of AFDC benefits. 42 U.S.C. § 602(a)(26)(A). States in turn were required to amend their Title IV–A plan, *see id.* at § 602(a)(27), assuming responsibilities for enforcement of absent parents' child-support obligations [hereinafter "child-support enforcement," or "CSE"], under a program outlined in a new Title IV–D of the statute, 42 U.S.C. § 651 *et seq.*[2] Among other provisions, Title IV–D requires States to "pass through" to AFDC recipients the first $50 of each monthly child-support payment the States recover from absent parents of AFDC recipients. *See id.* at § 657(b); *see also Wilcox v. Ives,* 864 F.2d 915, 916–17 (1st Cir. 1988) (discussing origins and statutory background of States' "pass through" obligation).

Moreover, under Title IV–A, a State which pays out less in AFDC benefits than a family's predetermined "level of need" is required to provide supplemental monthly payments, drawn from its Title IV–D child-support recovery, up to the amount necessary to fill the "gap."[3] 42 U.S.C. § 602(a)(28); *see also Stowell v. Secretary of HHS,* 3 F.3d 539, 540–41 (1st Cir.1993) ("*Stowell II*") (describing "gap-filling" under the Act); *Doucette v. Ives,* 947 F.2d 21, 24–25 (1st Cir.1991) (discussing origins and statutory background of "gap" payment obligation); *see generally Wehunt v. Ledbetter,* 875 F.2d 1558, 1569–70 (11th Cir.1989) (per curiam) (Clark, J., dissenting) (comprehensive analysis of Title IV–D legislative history).

"Gap" payments are considered supplemental AFDC disbursements under Title IV–A, *see* Fed.Reg. 29223–25 (August 15, 1988), and must be "furnished with reasonable promptness to all eligible individuals," 42 U.S.C. § 602(a)(10), "without any delay attributable to the [State] agency's administrative process." *See* 45 C.F.R. § 206.10(a)(5). The $50 "pass-through" payments mandated by § 657(b) are disbursed under Title IV–D, not Title IV–A, and therefore are not covered by § 602(a)(10)'s "reasonable promptness" requirement. However, in 1988, responding to persistent reports of "long delays [by States] in distributing child support collections," *see* Cong.Rec. S7993 (June 16, 1988) (remarks of Senator Bradley), Congress amended Title IV–D, directing OCSE to establish specific time frames for "prompt" disbursement of "pass-through" payments by the States. 42 U.S.C. § 652(i). Pursuant to its statutory authority, OCSE adopted regulations requiring "pass-through" payment disbursements to eligible AFDC recipients, under 42 U.S.C. § 657, within *fifteen days* of

---

or "Maine." *See Stowell v. Ives,* 976 F.2d 65, 67 n. 1 (1st Cir.1992) ("*Stowell I*").

**2.** In order to monitor State performance under Title IV–D, Congress established an Office of Child Support Supervision ["OCSE"], to which it delegated substantial authority for standard-setting and administrative review. *See* 42 U.S.C. § 652(a); *see also Carelli v. Howser,* 923 F.2d 1208, 1213–15 (6th Cir.1991) (comprehensive review of OCSE duties and authority).

**3.** In order to offset expenditures made on the AFDC recipient's behalf, the State may retain any child-support recoveries from the absent parent above the amount required to fund the "gap" payments to the AFDC recipient. *See* 42 U.S.C. §§ 602(a)(8)(A)(vi); 657(b)(4). If a family is not receiving AFDC, or if the child-support recovery raises a family above the minimum income threshold for AFDC eligibility, the State must "pass through" the support payment in its entirety. *See id.* at §§ 657(b), 657(c); *see also* 45 C.F.R. § 232.20(b)(1).

the State's receipt of child-support payments from an absent parent or collecting agency. *See* 45 C.F.R. § 302.32(f)(2).[4]

## II

### PROCEDURAL HISTORY

Maine participates in the AFDC program as a "gap" state, *i.e.,* one whose AFDC benefits do not fully meet the AFDC recipient's designated "level of need."[5] Accordingly, Maine must make "gap" payments, as well as "pass-through" payments, to eligible AFDC recipients. Plaintiffs Albiston and Wingert are eligible AFDC recipients who assigned their child-support rights to Maine under § 602(a)(26)(A), but experienced significant delays (two and six months, respectively) in receiving "gap" and "pass-through" payments. Alleging "systemic" administrative deficiencies, plaintiffs brought the present class action for declaratory and injunctive relief under 42 U.S.C. § 1983.[6]

Although Maine disputes the severity of its "systemic" problems, it acknowledges that "gap payment" disbursements are delayed in individual cases by a variety of administrative factors, including inadequate staffing, computer programming errors, clerical mistakes, and errors caused either by collection agencies or other states. Maine also acknowledges that, as of the initiation of this lawsuit, it missed OCSE's 15-day deadline for processing "pass-through" payments in

approximately 66% of its qualifying AFDC cases. But it argues that Titles IV–A and IV–D, which require "substantial compliance" on penalty of cutbacks in federal funding, *see* 42 U.S.C. §§ 604(a)(2), 603(h), impose no corresponding, judicially cognizable obligation to make timely "gap" and "pass-through" payments *in individual cases,* and that plaintiffs therefore lack standing to enforce a timely-payment obligation in a private action under § 1983.[7]

## III

### DISCUSSION

The § 1983 remedy presumptively encompasses violations of federal statutory rights by state officials. *See Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980) (finding private cause of action under § 1983 to enforce rights conferred by Social Security Act). Nevertheless, certain post-*Thiboutot* cases, *see, e.g., Suter v. Artist M.,* —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), have been "difficult for lower courts to reconcile" with the presumptive availability of a private right of action for statutory enforcement. *See Evelyn V. v. Kings County Hosp. Center,* 819 F.Supp. 183, 190 (E.D.N.Y.1993) (surveying § 1983 caselaw from *Thiboutot* to *Suter* ).

4. The Secretary subsequently amended the 15-day requirement to provide that the "pass-through" payment may be made within fifteen days after the *month in which payment was due* from the absent parent. *See* 57 Fed.Reg. 54519 (Nov. 19, 1992). Unless otherwise indicated, however, we refer to the version in effect at the time the present action was initiated.

5. When this action was brought, the gap between AFDC benefits and "level of need" for a family of three (one adult and two children) was $199. Maine subsequently reduced its "level of need," narrowing the "gap" obligation somewhat. Maine's AFDC "gap," and its later reduction in the "level of need," are discussed in *Stowell I,* 976 F.2d at 67, and in *Stowell II,* 3 F.3d at 541 & n. 1.

6. The district court certified Albiston and Wingert as representative of a plaintiff class consisting of

all present, former and future AFDC recipients with a present entitlement to pass-through and gap payments within the State of Maine:

(a) who have not received or will not receive their $50.00 pass-through payment under 42 U.S.C. § 657(b)(1) within 15 days of the date the child support from which the $50.00 payment is derived was received by the State of Maine; and

(b) who have not received or will not receive their "GAP" payment pursuant to 42 U.S.C. § 602(a)(28) by the month after the month in which the child support payment from which the GAP payment is derived was received by the State of Maine.

7. The Secretary is charged with conducting periodic audits of State performance under Title IV–D and has promulgated regulations deeming a State in "substantial compliance" with Title IV–D provided the applicable statutory requirements are met in 75% of the cases reviewed in the particular State. *See* 45 C.F.R. § 305.20.

In *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989), and *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508–09, 110 S.Ct. 2510, 2516–17, 110 L.Ed.2d 455 (1990), the Supreme Court synthesized prior case law, reaffirming the presumptive availability of a § 1983 remedy for violations of federal statutory rights, but articulating several broad exclusions.[8] First, because "section 1983 speaks in terms of *'rights,* privileges, or immunities, [rather than] violations of federal law," *Golden State*, 493 U.S. at 106, 110 S.Ct. at 448 (1989) (emphasis added), private relief is considered unavailable if the federal statute at issue does not "create enforceable rights." *Wilder*, 496 U.S. at 519, 110 S.Ct. at 2522 (citing *Wright*, 479 U.S. at 423, 107 S.Ct. at 770). Whether a statute creates "enforceable rights"

> turns on [A] whether 'the provision in question was intend[ed] to benefit the putative plaintiff.' If so, the provision creates an enforceable right unless it [B] reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless [C] the interest the plaintiff asserts is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.'"

*Id.* 496 U.S. at 509, 110 S.Ct. at 2517 (citations omitted). Second, § 1983 may be unavailable if "Congress ha[s] foreclosed private enforcement in the enactment" whose enforcement is sought, by providing an alternative, comprehensive administrative scheme for redressing individual plaintiffs' grievances under the statute. *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981); *Smith v. Robinson*, 468 U.S. 992, 1010–20, 104 S.Ct. 3457, 3467–3472, 82 L.Ed.2d 746 (1984).

The framework established in *Golden State* and *Wilder* continued to be used for several years in determining whether § 1983 permitted a private right of action for the enforcement of federal "spending" statutes. *See, e.g., Playboy Enterprises v. Public Svce. Com'n*, 906 F.2d 25, 32–33 (1st Cir.), *cert. denied,* 498 U.S. 959, 111 S.Ct. 388, 112 L.Ed.2d 399 (1990) (applying *Wilder* analysis; upholding private enforcement of "editorial control" provisions in Cable Communications Policy Act). Then, the Supreme Court appeared to depart from this framework in *Suter v. Artist M.,* —— U.S. at ——, 112 S.Ct. at 1360, where it considered whether an enforceable private right of action arose under the "reasonable efforts" provision of the Adoption Assistance and Child Welfare Act ["AACWA"]. The *Suter* Court acknowledged that the AACWA was "mandatory in its terms," in that it required States to "have a plan approved by the Secretary which ... provides that, in each case, reasonable efforts will be made (A) prior to the placement of a child in foster care, to prevent or eliminate the need for removal of the child from his home, and (B) to make it possible for the child to return to his home." *Id.,* —— U.S. at ——, 112 S.Ct. at 1367 (quoting 42 U.S.C. § 671(a)(15)). *Suter* noted, however, that the States were given "a great deal of discretion" in defining the terms of their compliance with the AACWA, since the statute, its legislative history, and the accompanying regulations provided no "further ... guidance ... as to how 'reasonable efforts' [were] to be measured." *Id.,* —— U.S. at ——, 112 S.Ct. at 1368–69. Accordingly, *Suter* held, Congress intended "to impose only a rather generalized duty on the State." *Id.,* —— U.S. at ——, 112 S.Ct. at 1370. And, this "generalized duty" was too vague to permit an inference that Congress had intended to "confer upon the child beneficiaries of the Act a right

---

**8.** The Court in *Wilder* found a private right to enforce a Boren Amendment requirement that Medicaid expenses be reimbursed at rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 496 U.S. at 507. The Court in *Golden State* upheld a private right, under § 1983, to enforce National Labor Relations Act provisions against

state interference in collective bargaining procedure. 493 U.S. at 112–13. Both cases cited approvingly to *Wright v. City of Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 423, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987), which upheld a private right to enforce the Brooke Amendment's statutory directive that public housing rents incorporate "reasonable" utility rates.

to enforce the requirement that the State make 'reasonable efforts' to prevent a child from being removed from his home, and once removed to reunify the child with his family." *Id.,* —— U.S. at ——, 112 S.Ct. at 1367. *Suter's* failure explicitly to apply the framework outlined earlier in *Wilder* led two dissenting Justices to assert that the holdings of the two cases were "plainly inconsistent," and that the *Suter* majority had "changed the rules of the game without even minimal justification," in effect overruling *Wilder, sub silentio.* —— U.S. at ——, ——, 112 S.Ct. at 1371, 1377 (Blackmun, J., dissenting).

In *Stowell I,* 976 F.2d at 68–70, this court examined the *Suter* dissenters' claim that *Suter* had overruled *Wilder. Stowell I* concluded, however, that though *Suter* "shed new light on this fuliginous area of the law," it was "much too early to post epitaphs for *Wilder* and its kin," and that it was "both prudent and possible to synthesize the teachings of *Suter* with the Court's prior precedents." 976 F.2d at 68.[9] Revisiting the issue today, we conclude that *Suter* left the basic *Wilder* framework intact, but added a further threshold inquiry, applicable in cases involving "federal-state funding statutes" enacted pursuant to the "Spending Clause." *See Pennhurst,* 451 U.S. at 17–18, 101 S.Ct. at 1539 (noting special attributes of statutes enacted under Spending Clause, which assume "the nature of a contract" between state and federal governments); *see also Suter,* —— U.S. at —— & n. 7, 112 S.Ct. at 1366 & n. 7 (quoting *Pennhurst,* and noting AACWA's enactment pursuant to Spending Clause). When federal-state funding statutes enacted pursuant to the Spending Clause "fail[ ] to impose a *direct obligation on the States,* instead placing the onus of

compliance with the statute's substantive provisions on the federal government, no cause of action cognizable under section 1983 can flourish." *Stowell I,* 976 F.2d at 70 (emphasis added).

 Viewed in this light, *Suter's* impact on our § 1983 jurisprudence is neither particularly "far-reaching" nor "plainly inconsistent" with prior precedent. Since *Suter,* § 1983 cognizability in the ambiguous context of shared state-federal obligations contemplates that the alleged breach of statutory rights shall have resulted from some impermissible "*state* action," rather than from a mere default in the performance of a federally-retained obligation. This said, however, two other aspects of *Suter's* holding require our consideration.

 First, although a congressional intent to *create* "enforceable rights" may be presumed simply from the enactment of a federal statute mandating performance of specific duties, *see Golden State,* 493 U.S. at 112–13, 110 S.Ct. at 451–52, a congressional intent to *impose those obligations on participating States* may not be presumed, but must be demonstrated by the § 1983 plaintiff. *Suter,* —— U.S. at ——, 112 S.Ct. at 1367–68. Second, and equally important, in order to "impose a direct obligation on the States," the plaintiff must show that Congress has delineated the obligation "unambiguously," *i.e.,* with sufficient specificity to permit States to "exercise their choice [to participate in the statutory scheme] knowingly, cognizant of the consequences of their participation." *See Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1539. A federally-imposed statutory obligation is not enforceable in a private action against the State under § 1983

---

9. For one thing, *Suter* offered no analytic framework to replace the structure erected in the Court's previous decisions. For another thing, the *Suter* Court, while weakening earlier precedents in certain important respects, was careful not to overrule them. Indeed, the majority relied on those precedents as pertinent authority. *Stowell I,* 976 F.2d at 68. Other courts of appeals also have found *Suter* reconcilable with "*Wilder* and its kin." *See, e.g., Procopio v. Johnson,* 994 F.2d 325, 331 n. 9 (7th Cir.1993); *Clifton v. Schafer,* 969 F.2d 278, 283–85 (7th Cir. 1992); *Dorsey v. Housing Auth. of Baltimore,* 984

F.2d 622, 631 (4th Cir.1993). Some further confirmation of this position may have been offered last Term, when Justice White, a member of the *Suter* majority, cited *Suter* alongside *Wilder* and *Wright* in a dissenting opinion—a juxtaposition which went unremarked by the majority. *See New York v. United States,* —— U.S. ——, ——, 112 S.Ct. 2408, 2445, 120 L.Ed.2d 120 (1992) (White, J., dissenting) ("we have upheld § 1983 suits to enforce certain rights created by statutes pursuant to the Spending Clause [citing *Wilder* and *Wright* ], though Congress must be cautious in spelling out the federal rights clearly and distinctly [citing *Suter* ]").

if its terms are so vague and generalized that their "meaning will . . . vary with the circumstances of each case" so as to be insusceptible to judicial enforcement. *See Suter,* —— U.S. at —— – ——, 112 S.Ct. at 1368–70; *see also Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1539 ("The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' There can . . . be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it") (citations omitted).

## A. *A Statute Enacted Under the Spending Power Must Delegate a Mandatory Duty Directly to the States*

█ We agree with plaintiffs that the challenged statute and its implementing regulations satisfy *Suter*'s threshold mandate by imposing reasonably clear, judicially enforceable obligations directly on the participating States. We begin with the statutory provisions covering gap payments. Under Title IV–A, in order to receive federal subsidies under the AFDC program, a State is obligated to adopt a plan, *see King v. Smith,* 392 U.S. at 333, 88 S.Ct. at 2141, which ". . . provide[s] that aid to families with dependent children *shall* be furnished with reasonable promptness." *See* 42 U.S.C. § 602(a)(10)(A) (emphasis added). Moreover, the State's obligation does not cease once it obtains initial administrative approval of its plan; even *after* the Secretary has given administrative approval, the State *must also* "comply substantially with [all] provisions required by section 602(a) . . . to be included in the plan," *id.* at § 604(a)(2). If a State is not in compliance with the terms of its plan, the Secretary "*shall* make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failures)." 42 U.S.C. § 604(a) (emphasis added). Like the "reasonable efforts" requirement in *Suter,* these requirements are "mandatory in [their] terms," —— U.S. at ——, 112 S.Ct. at 1367. Indeed, then-Justice Rehnquist's *Pennhurst* opinion quoted the statutory predecessor to § 602(a)(10), including its "reasonable promptness" language, as an example of an "instance[ ] where Con-

gress . . . intended the States to fund certain entitlements as a condition of receiving federal funds, . . . [and] proved capable of saying so explicitly." 451 U.S. at 17–18, 101 S.Ct. at 1540. *See also, e.g., Carleson v. Remillard,* 406 U.S. 598, 600, 92 S.Ct. 1932, 1934, 32 L.Ed.2d 352 (1972) (stating that § 602(a)(10) "places *on each State* participating in the AFDC program the requirement that 'aid to families with dependent children shall be furnished with reasonable promptness to all eligible individuals' ") (emphasis added); *King v. Smith,* 392 U.S. at 333, 88 S.Ct. at 2141 (asserting that State of Alabama "*breached its federally imposed obligation* [under statutory predecessor to § 602(a)(10) ] to furnish 'aid . . . with reasonable promptness to all eligible individuals' ") (emphasis added).

█ Seemingly no less clear is the delegation to the States of the Title IV–D mandated obligation to disburse "pass-through" payments in a timely fashion. Section 654(13) provides that a State child-support plan must provide, in pertinent part, "that the State will comply with such other requirements and standards as the Secretary determines to be necessary." Section 657(b) of Title IV–D governs the terms under which "amounts collected as support by a State . . . shall . . . be distributed" by the collecting State. (Emphasis added.) The 1988 amendments to Title IV–D require OCSE, as part of its "standards for State programs," 42 U.S.C. § 652(a)(1), to promulgate mandatory regulations which "*shall* include standards establishing time limits governing the period or periods within which a State *must* distribute, in accordance with section 657 of this section, amounts collected as child-support pursuant to the State's plan." *Id.* at § 652(i) (emphasis added). The OCSE regulations in effect at the commencement of this litigation provided that

Amounts collected by the IV–D agency on behalf of recipients of aid under the State's title IV–A . . . plan . . . *shall* be distributed as follows:

(i) . . . When the IV–A agency sends payments to the family under § 302.51(b)(1) of this part, the IV–D agency *must* forward any amount due the family under § 302.-

51(b)(1) to the IV–A agency within 15 calendar days of the date of initial receipt in the State of the first $50 of support collected in a month, or, if less than $50 is collected in a month, within 15 calendar days of the end of the month in which the support was collected.

45 C.F.R. § 302.32(f)(2) (later revised; *see* 57 Fed.Reg. 54519 (November 19, 1992)) (emphasis added). In addition, a State that fails to achieve "substantial compliance" with the Title IV–D requirements, including its § 657 distribution obligations and OCSE's 15–day "promptness" provision, *shall* have "amounts otherwise payable ... reduced." 42 U.S.C. § 603(h)(1) (emphasis added). We conclude that these provisions impose a specific, definite and mandatory obligation directly on participating States. *See generally Howe v. Ellenbecker*, 774 F.Supp. 1224, 1230 (D.S.D. 1991) (considering Title IV–D in light of *Pennhurst;* "The language in Title IV–D is mandatory and set[s] out in specific and definite terms .... what states must do to participate in the program"); *Behunin v. Jefferson Cty. Dept. of Social Servs.*, 744 F.Supp. 255, 258 (D.Colo.1990) ("The mandatory language of Title IV–D, and its clear intent to benefit children and their families[,] distinguish this statute from the statute considered in *Pennhurst*"); *Carelli v. Howser*, 733 F.Supp. 271, 276 (S.D.Ohio 1990) (citing § 654(13); "the language of Title IV–D is clearly mandatory rather than precatory," and creates "specific and definite benefits"), *rev'd on other grounds*, 923 F.2d 1208 (6th Cir.1991).

It is the imposition of mandatory obligations directly on the States, as distinguished from the Secretary, that separates the "promptness" obligations under Titles IV–A and IV–D from the statutory provisions considered in *Suter* and *Stowell I*. In *Suter*, the Court concluded that the AACWA requirement of "reasonable efforts" was "mandatory," and "does place a requirement on the States," but held that because of its vagueness "that requirement *only goes so far as to ensure that the State have a plan approved* by the Secretary which contains the 16 listed features." —— U.S. at ——, 112 S.Ct. at 1367 (emphasis added). Likewise, in *Stowell I*, 976 F.2d at 69, plaintiffs sought § 1983 enforcement of a statutory provision which—

> simply and forthrightly provides, in *haec verba*, that 'the Secretary shall not approve any State plan for medical assistance' if the State has reduced AFDC payment levels below the level prevailing on May 1, 1988. 42 U.S.C. § 1396a(c)(1). By its express terms, section 1396a(c)(1) obliges the federal government, in the person of the Secretary of Health and Human Services—not the State—to take action. The statute could scarcely be clearer.

In the present case, on the other hand, although the Secretary retains oversight responsibility for monitoring "substantial compliance" with the State's plan, plaintiffs do not base their statutory claim on the Secretary's nonperformance of these oversight obligations, but on the State's *separate* "compliance" obligations as mandated. And, as discussed in Part D, *infra*, the Secretary's oversight responsibilities are neither incompatible with, nor exclusive of, Congress' imposition *upon the participating State* of the direct responsibility for fulfilling its plan obligations to the statute's intended beneficiaries. *Rosado v. Wyman*, 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970); *Lynch v. Dukakis*, 719 F.2d 504, 511, 512 (1st Cir. 1983).[10]

**B. *The State's Obligation Must Be "Unambiguous"***

Invoking *Suter*'s requirement that delegated obligations be not only "mandatory" but

---

**10.** Although further discussion of this issue is reserved for Part D, *infra*, we pause to note one additional point. We do not read *Suter* as disturbing the principle, articulated in *Wilder* and other cases, that a statute may impose obligations on the States despite the existence of a parallel administrative scheme for the enforcement of overall compliance with statutory provisions. *See Wilder*, 496 U.S. at 512, 110 S.Ct. at 2518. Although *Suter* cited the AACWA's administrative enforcement mechanisms in passing, to "show that the absence of a remedy to private plaintiffs under § 1983 does not make the reasonable efforts clause [of the AACWA] a dead letter," it made clear that its brief discussion of this subject was intended as an "aside," and not to supplant the more detailed inquiry required by *Smith v. Robinson, supra*, and *Middlesex County Sewerage Authority, supra*. *See* —— U.S. at —— —— & n. 11, 112 S.Ct. at 1368–69 & n. 11.

"unambiguous," the State raises two additional arguments concerning the alleged vagueness of the obligations imposed by Titles IV–A and IV–D. First, the State argues, the statutory requirement of "substantial" rather than "total" compliance with a Title IV–D plan, *see* 42 U.S.C. § 602(a)(27), renders the State's "promptness" obligation under the plan ambiguous in individual cases, and therefore unenforceable in a private action under 42 U.S.C. § 1983. *See Mason v. Bradley,* 789 F.Supp. 273 (N.D.Ill.1992) ("full compliance with the regulations in every case is clearly not required"); *Oliphant v. Bradley,* No. 91–C3055, 1992 WL 153637, at *9 1992 U.S.Dist. LEXIS 8975, at *23 (N.D.Ill. 1992) ("had Congress intended to mandate compliance [in individual cases] with the time frames set out in the regulations, it would have conditioned receipt of federal funds on *total,* rather than substantial, compliance") (emphasis added).[11]

■ We think Maine misapprehends the import of the § 602(a)(27) "substantial compliance" requirement in this case. By its terms, the "substantial compliance" obligation applies only to the State's compliance with the terms of the State *plan itself,* as defined in 42 U.S.C. § 654. However, the 15–day compliance time frame imposed by OCSE under 45 C.F.R. § 302.32(f)(2) is not directly imposed *as part of the State's plan,* but stems from a separate statutory provision, 42 U.S.C. § 652(i), which specifically relates the OCSE 15–day regulation to "the period or periods within which the State must distribute [amounts collected as child-support], in accordance with section 657 of this section." As § 657 itself is mandatory, the 15–day compliance requirement imposed thereunder takes precedence over the more general "substantial compliance" directive

made applicable to the State's plan by § 602(a)(27).

Alternatively, it may be possible, of course, to construe Maine's "substantial compliance" argument as resting on the provisions of sections 604(a)(2) and 603(h), which authorize the Secretary to withhold funds from States which do not "comply substantially" with Titles IV–A and IV–D. But if this is Maine's position, it too must fail. For one thing, with respect to the Secretary's argument under Title IV–D, § 603(h)(3) provides that "for purposes of section 602(a)(27) of this title, ... a State which is not in full compliance with the requirements of this part shall be determined to be in substantial compliance only if the Secretary determines that any noncompliance is of a *technical nature* which does not adversely affect the performance of the child-support enforcement program" (emphasis added). More generally, however, the "substantial" compliance required to avoid administrative penalties under *both* provisions is independent of, and narrower than, the State's direct obligation to AFDC recipients. *See Wilder,* 496 U.S. at 514–15 & n. 11, 110 S.Ct. at 2520–21 & n. 11 (findings and assurances to Secretary, prior to plan approval, are separate from subsequent obligation to comply with assurances). As the Ninth Circuit has stated, in an analogous context, "[t]he funding standard [of 'substantial compliance'] is not ... the measure of what the regulations require; it is intended to measure how great a failure to meet those requirements should cause funds to be cut off." *Withrow v. Concannon,* 942 F.2d 1385, 1387 (9th Cir.1991).

Indeed, the AACWA, construed in *Suter,* also contained a provision, 42 U.S.C. § 671(b), requiring "substantial compliance" with the terms of the State-presented plan,

---

11. *But see King v. Bradley,* 829 F.Supp. 989, 994 (N.D.Ill.1993) ("although no individual plaintiff or class of plaintiffs has an enforceable right or guarantee to be among the 75 percent of cases that must be handled in conformance with federally regulated procedures ...[,] [a]ny plaintiff or class of plaintiffs that fails to receive services in compliance with federal regulations when the state is running a Title IV–D program which does not substantially comply with federal procedures does have the right to sue to enjoin the State to improve its level of conformance until it is in

substantial compliance."). In the present case, the district court's factual findings suggest that Maine had not achieved "substantial compliance" with the relevant statutory provision. *Compare, e.g., Shands v. Tull,* 602 F.2d 1156, 1160–61 (3d Cir.1979) (barring private suit for enforcement of AFDC statute, where State was in "substantial compliance" with statutory provisions, but indicating that injunctive suits may be permissible where "agencies have failed to reach even substantial compliance with statutory standards").

or face cutbacks in aid. Although *Suter* cited this statutory provision for a different proposition, 112 S.Ct. at 1368–69 (discussing alternative "enforcement mechanisms" under the AACWA), the *Suter* majority nowhere intimated that it thought the administrative requirement of "substantial compliance" contributed to the ultimate ambiguousness of the States' "reasonable efforts" obligation.

Citing *Suter*'s disapproval of the "reasonable efforts" provision, Maine also argues that the Title IV–A obligation of "reasonable promptness," 42 U.S.C. § 602(a)(10), is " 'too vague and amorphous,' " placing it " 'beyond the competence of the judiciary to enforce.' " *Wright,* 479 U.S. at 431–32, 107 S.Ct. at 774–75. Again, however, Maine misapprehends *Suter*'s holding. A statute is not impermissibly vague simply because it requires judicial inquiry into "reasonableness." *See, e.g., Wilder,* 496 U.S. at 519–20, 110 S.Ct. at 2522–23 ("reasonable and adequate rates"); *Wright,* 479 U.S. at 437, 107 S.Ct. at 777 ("reasonable" utilities allowance); *see generally, e.g., Virginia R. Co. v. System Fed'n No. 40,* 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937) ("whether action taken or omitted is … reasonable [is an] everyday subjec[t] of inquiry by courts in framing and enforcing their decrees"). Rather, the relevant question is whether the *action or purpose* whose "reasonableness" is commanded has been clearly delineated and is susceptible of judicial ascertainment. *See Suter,* ── U.S. at ──, 112 S.Ct. at 1368 (distinguishing *Wilder* as "set[ting] forth in some detail the factors to be considered in determining the methods for *calculating rates*") (emphasis added). Here, like the "rates" considered in *Wilder,* or the utility allowance in *Wright*—and unlike the *"efforts"* prescribed, without elaboration, in the AACWA—"promptness of payment" presents a straightforward, identifiable standard which we previously have found readily susceptible of judicial evaluation. *Coalition for Basic Human Needs v. King,* 654 F.2d 838, 841 (1st Cir.1981) (finding AFDC plaintiffs "likely to succeed" on

§ 1983 claim based on violation of "reasonable promptness" provisions in § 602(a)(10)).

■ Moreover, to the extent further guidance may be required to demarcate the contours of reasonable "promptness" in the Title IV–A context, the regulations promulgated by the Secretary state that "financial assistance [under the AFDC program] … shall be furnished promptly to eligible individuals *without any delay attributable to the agency's administrative process."* 45 C.F.R. § 206.10(a)(5)(i) (emphasis added). We are not persuaded by Maine's contention that "the language of the regulation offers no … assistance in determining the difference between necessary processing time and administrative delay." *Cf. California Dept. of Human Resources Development v. Java,* 402 U.S. 121, 133, 91 S.Ct. 1347, 1354, 28 L.Ed.2d 666 (1971) (relying on purposes of Social Security Act to construe statutory requirement that state unemployment compensation programs be "reasonably calculated to insure full payment of unemployment compensation when due"). Rather, this interpretation plainly equates reasonable "promptness" in furnishing financial assistance with an *absence of delay due to the State's administrative process.* We think it clear, therefore, that the reference to "delay," considered in context, means *"unreasonable* delay," excluding whatever reasonable processing time is required to credit the child-support received, determine the amount of the gap payment, and issue a check. *Cf. Beasley v. Harris,* 671 F.Supp. 911, 915–16 (D.Conn.1987) (similar argument).[12]

## C. *Section 1983 Plaintiffs Must Be Intended Beneficiaries of Delegated Obligations*

As we conclude that the relevant Title IV–A and IV–D provisions satisfy the threshold test under *Suter,* by directly delegating to the States an unambiguous statutory obligation to make reasonably "prompt" payments to AFDC recipients, we turn next to

12. We are not suggesting that error-free compliance is likely to be achieved in administering this program, any more than in other programs administered by agencies with limited resources. But this reality does not afford the State a safe harbor merely because its overall rate of compliance is adequate to avoid the ultimate program sanction—a cutoff of federal funding. Moreover, if plaintiffs' allegations are to be credited, Maine falls below even that level of compliance.

*Wilder*'s three-part test for determining whether the statutory "rights, privileges and immunities" afforded AFDC recipients under the Social Security Act are of a kind Congress meant to be enforceable under § 1983. Since we have determined that the statutory responsibilities imposed upon the States by the CSE program are "unambiguous" and "mandatory" within the meaning of *Suter*, the second and third parts of the *Wilder* test, requiring a similar analysis, seem clearly to be met. Accordingly, the *Wilder* "enforceable right" determination, "as reconfigured by the neoteric principles announced in *Suter*," *see Stowell I*, 976 F.2d at 68, turns largely on the first part of the *Wilder* test: "whether 'the provision in question was intend[ed] to benefit the putative plaintiff.'" 496 U.S. at 509, 110 S.Ct. at 2517.

 Maine concedes, for purposes of this appeal, that the plaintiff class is comprised of "intended beneficiaries" of the requirement that Title IV–D child-support be "promptly" distributed. Although the Eleventh Circuit has held otherwise, *see Wehunt v. Ledbetter*, 875 F.2d 1558, 1565–66 (11th Cir.1989) (Title IV–D's collection provisions primarily intended to benefit "the public fisc," not individual claimants, and therefore do not give rise to enforceable private rights), we accept Maine's concession, which conforms in any event with the conclusion reached by most courts that have considered the issue, and with our prior characterizations of Title IV–D in dictum. *See, e.g., Carelli v. Howser*, 923 F.2d 1208, 1211 (6th Cir.1991) (rejecting *Wehunt*; finding that Title IV–D was intended *both* "to protect needy families with children [and to protect] the public fisc"); *see also Doucette v. Ives*, 947 F.2d at 24 (dictum) ("the CSE program [was] designed *both* to assist parents in collecting child support ... and to reduce state and federal government AFDC expenditures") (emphasis added); *accord, Howe v. Ellenbecker*, 774 F.Supp. 1224 (D.S.D.1991) (same); *Behunin v. Jefferson County Dept. of Social Services*, 744 F.Supp. 255, 257–58 (D.Colo.1990) (same).

### D. Congress Must Not Have Expressed Intent to Preclude Recourse to Private Remedies

Maine's final salvo is that Congress preempted private enforcement actions under Titles IV–A and IV–D by establishing in the governing statute a comprehensive and *exclusive* administrative enforcement scheme. *Wilder*, 496 U.S. at 520–21, 110 S.Ct. at 2523–24. The Supreme Court repeatedly has stated that it "will not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right," *Wright*, 479 U.S. at 423, 107 S.Ct. at 770. Accordingly, where a federal statute erects an administrative scheme for its enforcement, the Court has required States to demonstrate, "by express provision or other specific evidence from the statute itself," *id.*, a congressional intent to preclude private enforcement actions. On only two occasions, however, has the Court found "express preclusion" of the § 1983 remedy. In both instances the challenged statute itself expressly included *remedies* permitting private citizens to compel State compliance with the statutory scheme. *Smith v. Robinson*, 468 U.S. 992, 1009–13, 104 S.Ct. 3457, 3467–69, 82 L.Ed.2d 746 (1984) (statute provided individualized administrative hearings and judicial review for individual beneficiaries); *Sea Clammers*, 453 U.S. 1, 20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981) (statute created "quite comprehensive enforcement scheme," with "many specific statutory remedies, including the two citizen-suit provisions").

In the present case, Maine does not claim that Titles IV–A and IV–D contain express provisions foreclosing private enforcement actions. Nor does it contend that the statute provides a specific statutory remedy enabling aggrieved AFDC recipients to obtain redress for wrongfully-delayed payments. Instead, it argues that "express preclusion" of a private § 1983 remedy is demonstrated by the statute's establishment of OCSE; the grant to OCSE of responsibility for setting and monitoring standards for "substantial compliance" with the statutory scheme; and OCSE's administrative responsibility under the statute for imposing financial sanctions on States whose programs do not "substantially comply." 42 U.S.C. § 652(a).

 Although one court of appeals has accepted a similar argument, finding it un-

likely "that Congress intended to occupy the same ground at the same time and in the same manner as the Secretary," *Carelli,* 923 F.2d at 1215–16, we respectfully disagree. In our view, the OCSE administrative enforcement scheme, authorizing penalties against participating States for "substantial noncompliance," seems intended to protect important *federal* interests, including prompt disbursement of federal funds to needy AFDC recipients as mandated by Congress, by ensuring that *overall* performance by the participating State does not fall below federally-prescribed levels. The private remedy afforded by § 1983, on the other hand, safeguards the *individual AFDC recipient's interests* in the timely receipt of the mandated federal benefits. Though coexistent, at best these interests overlap imperfectly. For example, a State may avoid coercive administrative penalties by disbursing "pass-through" and "gap" payments reasonably promptly in 76% of its AFDC cases, while violating the statutory rights of the other 24% of eligible AFDC recipients. *Cf. Withrow,* 942 F.2d at 1387 ("From the standpoint of the applicants or recipients who are denied [statutory benefits] within the time mandated by federal regulations, it is no comfort to be told that there is no federal remedy because the state is in 'substantial compliance' with the federal requirements") (footnote omitted).

Accordingly, the Supreme Court repeatedly has held that administrative enforcement schemes must be presumed to *parallel* the private § 1983 enforcement remedy, rather than to "occupy the same ground" as the State contends. *Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970) (Secretary's authority to withhold funds under § 604(a) does not preclude private actions to enforce individual rights under Title IV–A; "we are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program"); *Howe,* 774 F.Supp. at 1230 (rejecting argument that Title IV–D rights are unenforceable under *Sea Clammers* ); *see also Wright,* 479 U.S. at 428, 107 S.Ct. at 773 (Secretary's "authority to audit, enforce annual contributions con-

tracts, and cut off federal funds ... [are] generalized powers [which] are insufficient to indicate a congressional intention to foreclose § 1983 remedies"); *see generally* Ashish Prasad, Note, *Rights Without Remedies: Section 1983 Enforcement of Title IV–D of the Social Security Act,* 60 U.Chi.L.Rev. 197, 221 (1993) ("without a § 1983 remedy, needy families with children are completely deprived of access to the federal courts to secure child support enforcement services granted them by Title IV–D"). Indeed, *Wilder* suggests that in certain circumstances an administrative enforcement scheme may even *support* the finding of a private right. *See* 496 U.S. at 514–15, 110 S.Ct. at 2520–21 ("If the Secretary is entitled to reject a state plan upon concluding that a State's assurances of compliance are unsatisfactory ... a State is on notice .... [of] the concomitant obligation [to beneficiaries] to adopt reasonable and adequate rates"). Accordingly, we decline to disturb the presumption, articulated in *Rosado, Wilder* and earlier cases, that the OCSE administrative enforcement scheme parallels and does not displace the private § 1983 enforcement remedy.

## IV

### *CONCLUSION*

We hold that individual AFDC recipients possess standing to bring a private action against the State, under 42 U.S.C. § 1983, to enforce their right to prompt disbursement of their child-support entitlements under Titles IV–A and IV–D of the Social Security Act.

*The judgment of the district court is affirmed.*