**VISITING NURSE ASSOCIATION OF NORTH SHORE, INC., et al, Plaintiffs,**

v.

**Bruce M. BULLEN, et al., Defendants.**

**Civ. A. No. 94–10123–NG.**

United States District Court,
D. Massachusetts.

Oct. 12, 1994.

**1446**

John Mason, Richard P. Ward, and Susan T. Nicholson, Ropes & Gray, Boston, MA, for plaintiffs.

William L. Pardee, Office of the Atty. Gen. and Douglas Wilkins, Office of the Atty. Gen., Crim. Bureau, Boston, MA, for defendants.

### CORRECTED MEMORANDUM AND ORDER

GERTNER, District Judge.

## I. INTRODUCTION

This is a suit by providers of home health services, challenging the rates set by the state under Title XIX of the Social Security Act ("the federal Medicaid Act"), 42 U.S.C. § 1396a *et seq.* On January 1, 1994, the defendants[1] implemented a system for the reimbursement of such services which all parties agree was "new" in several respects. The old approach, "provider cost-based reimbursement,"[2] reimbursed each agency for Medicaid services based on that agency's costs for its most recent fiscal year (adjusted for inflation and subject to certain caps and incentives). The new system, a "class rate" system, selected a single rate, applicable to all agencies throughout the Commonwealth regardless of actual cost for each of the categories of home health services.

Plaintiffs are nine visiting nurse associations[3] seeking declaratory and injunctive relief against the defendants under 42 U.S.C. § 1983 on the grounds that the new class rates—both in terms of how they were determined, the factors taken into account or ignored, and how they have been implemented—did not comply with the federal Medicaid Act and its regulations. The core of the plaintiffs' claim is that the new rates were driven by budgetary constraints, not the statutory factors.[4]

While the state may take budgetary factors into consideration, especially in a time of general belt-tightening, it may not flout the statutory requirements. The defendants' discretion in setting rates is limited by 42

---

**1.** The defendants are the following: Paula R. Griswold is the Chairperson and a Commissioner of the Massachusetts Rate Setting Commission ("RSC"); Jonelle L. Soelling and Louis I. Freedman are also Commissioners of the RSC. Bruce Bullen is the Commissioner of the Division of Medical Assistance (the "DMA") and formerly Associate Commissioner of the Department of Public Welfare. The RSC is an agency of the Commonwealth which, under M.G.L. c. 6A § 32, is responsible for establishing rates for providers of Medicaid services, subject to review of the DMA. The DMA is the state agency responsible for administering the Massachusetts Medical Assistance Program ("Medicaid Program") established under the federal Medicaid Act, 42 U.S.C. § 1396a et seq. DMA is authorized under M.G.L. c. 118E § 13 to review and to approve or disapprove any changes in rates or in rate methodology proposed by the RSC.

**2.** The complaint alleges that prior to the recent changes, each agency had its own rates for the five service categories or disciplines of skilled nursing, occupational therapy, physical therapy, speech therapy and home health aide services.

An agency's overhead costs were reimbursed, subject to the limitation that they could not exceed a certain percentage of the agency's total costs. That percentage, set at the median overhead percentage of agencies statewide, was 42.9 percent for the period 1987 to 1991.

**3.** Visiting Nurse Association of North Shore, Inc., Visiting Nurse Association of Boston, South Shore Visiting Nurse and Health Services, Inc., Brockton Visiting Nurse Association, Holyoke Visiting Nurse Association, Inc., VNA Homecare, Inc., Visiting Nurse Association of Greater Lowell, Inc., Visiting Nurse Association of Pioneer Valley, Inc., and Visiting Nurse Association of Central Massachusetts, Inc.

**4.** The net effect of the class rate system, the plaintiffs allege, is a substantial drop in the level of reimbursement. They claim that for the majority of the nine agencies, the new class rates would not be sufficient to cover the costs which the agencies incurred even in 1990 or 1991, much less those that they incurred in 1994.

U.S.C. § 1396a(a)(30)(A) [hereinafter "(30)(A)"]. The "Equal Access" provision of (30)(A) requires the state defendants to fix the rates at a level consistent with both "efficiency, economy and quality of care" and sufficient to enlist enough providers so that Medicaid recipients have access to services equal to that of the general population in that geographic area.[5] If budgetary restraints make it impossible for a state to comply with the statutory standards, so it is argued, they ought not participate in the program. This challenge to the rate setting itself shall be the subject of the trial on the merits.

As a preliminary · matter, the plaintiffs raise two related procedural issues. They claim that defendants did not give adequate public notice of the rates and the new methodology undergirding them (the "public notice issue"). Nor, they allege, was the new approach spelled out with any specificity in the state plan amendment which the defendants were obliged to submit to the Health Care Financing Administration ("HCFA") for approval by the Secretary of Health and Human Services (the "plan amendment issue").

On March 8, 1994, plaintiffs moved for partial summary judgment based on the public notice and state plan amendment issue. They seek a declaration that 114.3 CMR § 3.00 as revised effective July 1, 1993, implementing the class rates, and its predecessor regulations, implementing the interim rates between July 1, 1991 and June 30, 1993, are void, and an injunction stopping implementation until the state complies with the regulations.[6] Defendants have also moved for partial summary judgment on the same issues.

On March 9, 1994, defendants moved to dismiss on several grounds: (1) that § (30)(A) does not create a right enforceable by these providers; (2) that the complaint fails to allege an actual controversy under § (30)(A); (3) that plaintiffs' challenge to certain transitional rates implemented before the new class rates were in effect should be dismissed for want of jurisdiction, and (4) that the complaint should be dismissed for failure to state a "simple, concise and direct" claim in violation of Fed.R.Civ.P. 8.

A hearing was held on all pending motions on May 20, 1994. For the reasons that follow, the Court **DENIES** the defendants' motion to dismiss with respect to both the July 1, 1993 rates, and the transitional rates. The Court also **GRANTS** partial summary judgment for the plaintiffs only on the claim that the implementation of the current class rate (embodied in 114.3 CMR § 3.00 as revised effective July 1, 1993) did not comply with either the plan or the notice requirements of the Federal Medicaid Act, and that such implementation should be enjoined pending compliance. Since the Court requires additional briefing on the subject of the validity of the interim rates, it stays enforcement of this Order pending a determination of: (1) The length of time it will take the state to effect compliance; and, (2) Should it be necessary, which regulation (apart from the most recent regulation implementing the class rates as revised July 1, 1993) should be in effect in the interim. *See* Section IV, *infra*.

## II. DEFENDANTS' MOTION TO DISMISS

■ In order to decide the pending motion to dismiss, the Court is obliged to assume the truth of a plaintiffs' well pleaded factual allegations making all reasonable inferences in plaintiffs' favor. *See, Garita Hotel Ltd. v. Ponce Federal Bank,* 958 F.2d 15, 17 (1st Cir.1992).

---

5. *Section 1396a(a)(30)(A) provides that the state plan must:*

 ... provide such methods and procedures relating to ... the payment for care and services available under the plan ... as may be necessary ... to safeguard against unnecessary utilization of such care and services and to ensure that payments are consistent with efficiency, economy, and quality of care and are suffi-

cient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

6. See section IIIB for a description of the history of the rate setting regulations at issue in the instant case.

**A. Whether 42 U.S.C. § 1396a(a)(30)(A) Confers a Right Enforceable Under 42 U.S.C. § 1983.**

### 1. *Framework for Analysis*

Section 1983 provides a cause of action for persons subject to the "deprivation of any rights, privileges or immunities secured by the Constitution and laws of the United States." The statutory right that the plaintiffs seek to enforce is the right under § 1396a(a)(30)(A) to rates that are consistent with efficiency, economy and quality of care and that are sufficient to ensure that Medicaid recipients have equal access to services.

For the past twenty years, the Supreme Court has reaffirmed the holding that the phrase "and laws" of § 1983 creates a federal cause of action against state officials for violation of rights defined by federal statutes.[7] To be sure, the case law has recognized that not all federal statutes confer rights enforceable under § 1983, a result that could supplant other specific federal enforcement mechanisms, or totally undermine the political compromises that may have given rise to the statute. Much of the litigation has focussed on the issue of identifying statutory rights and the circumstances under which they may be enforced.

■ In *Golden State Transit Corp. v. Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448–49, 107 L.Ed.2d 420 (1989) and *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Supreme Court fashioned a two step analysis. In the first step, the court asks three questions: a) Whether the statutory provision " 'was intend[ed] to benefit the putative plaintiff,' " *Wilder v. Virginia Hospital Ass'n., supra* at 509, 110 S.Ct. at 2517 (1990) (quoting *Golden State Transit Corp. v. Los Angeles, supra* at 106, 110 S.Ct. at 448–49

(1989)). If so, the provision creates an enforceable right unless it b) "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the governmental unit." *Wilder v. Virginia Hospital Ass'n, supra* at 509, 110 S.Ct. at 2517 (quoting *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 19, 101 S.Ct. 1531, 1541, 67 L.Ed.2d 694 (1981)). Finally, an enforceable right will exist unless c) the plaintiff's interest is so "vague and amorphous as to be" "beyond the competence of the judiciary to enforce." *Wilder v. Virginia Hospital Ass'n., supra* at 509, 110 S.Ct. at 2517 (quoting *Golden State Transit Corp. v. Los Angeles, supra* at 106, 110 S.Ct. at 448 and *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 431–32, 107 S.Ct. 766, 774–75, 93 L.Ed.2d 781 (1987)). On this issue, the party seeking to assert the right bears the burden of proof. *See Arkansas Medical Society, Inc. v. Reynolds,* 6 F.3d 519, 523 (8th Cir.1993).

■ In the second step, the inquiry focuses on whether Congress foreclosed private § 1983 enforcement by providing a comprehensive remedial scheme within the statute. *Golden State Transit Corp. v. Los Angeles, supra* at 106–107, 110 S.Ct. at 448–49. As to this issue, the defendant bears the burden of proof. *Id.* at 106–107, 110 S.Ct. at 448–49; *Arkansas Medical Society, Inc. v. Reynolds, supra* at 523. Applying the *Golden State* framework and continuing a tradition of § 1983 enforcement of the Social Security Act,[8] the Supreme Court in *Wilder* held that § 42 U.S.C. § 1396a(a)(13)(A) of the Medicaid Statute (hereinafter the "Boren Amendment" or § 13(A)) created an enforceable right under § 1983.

While the most recent decision of the Supreme Court, *Suter v. Artist M,* —— U.S.

---

7. Although § 1983 was originally enacted to insure equal rights for the newly emancipated slaves, the law referred more generally to rights secured "by the Constitution and laws" without specific reference to race discrimination.

The Court in Maine v. Thiboutot, 448 U.S. 1 (1980) dealing with the claimed denial of AFDC benefits under the Social Security Act, confirmed what had then been implicit—namely that the Social Security Act and other federal laws could be enforced through this section. *See, Rosado v.*

*Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Wilder v. Virginia Hospital Ass'n.,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). *See* generally, Sunstein, "Section 1983 and the Private Enforcement of Federal Law," 49 U.Chi.L.Rev. 394 (1982); Rosenblatt, "The Courts, Health Care Reform and the Reconstruction of American Social Legislation," 18 J.Health Policy. & Law 439 (1993).

8. See note 20 *infra.*

——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992),[9] has created some confusion in this area,[10] most courts, have taken the position that *Suter* did not change the *Golden State* analytical framework. In *Albiston v. Maine Commissioner of Human Services*, 7 F.3d 258 (1st Cir.1993), the court held that *Suter*, reflecting concerns that states be aware of their obligations prior to accepting federal funds, heightened the burdens on the plaintiff who sought to enforce a statute enacted under the Spending Power. It construed *Suter* as holding that the intent to impose conditions on the grant of federal monies directly on the states must be "demonstrated," not "presumed," and must be delineated unambiguously, i.e. "with sufficient specificity to permit states to exercise their choice [to participate in the statutory scheme] knowingly, cognizant of the consequences of their action." *Albiston v. Maine Commissioner of Human Services, supra* at 262–263 (quoting *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981)). Significantly, the *Suter* Court found that the Boren Amendment (which had been at issue in *Wilder*) also met the more rigorous *Suter* test. Section 13(A) of the Medicaid statute, the Court concluded, "actually required the states to adopt reasonable and adequate rates." *Id.,* —— U.S. at ——, 112 S.Ct. at 1368.[11]

The inquiry here is whether this conclusion applies as well to the neighboring section, § 30(A). In analyzing § 30(A), this Court is not without authoritative guidance—several decisions on point, as well as decisions from the Supreme Court and the circuit courts interpreting analogous provisions of the Social Security Act.

■ In *Arkansas Medical Society Inc. v. Reynolds,* 6 F.3d 519, 523 (8th Cir.1993), the Eighth Circuit concluded that § 30(A) conferred an enforceable right under § 1983. In effect, the court decided that the template for analysis of § 30(A) of the Medicaid statute was the analogous provision of the Medicaid statute at issue in *Wilder,* (§ 13(A)), and not the entirely different scheme, the Adoption Assistance and Child Welfare Act, at issue in *Suter.*[12] What the *Suter* and *Wilder* courts found distinctive about § 13(A)—characteristics that made it enforceable under § 1983 while the adoption statute before the Court in *Suter* was not—apply as well to § 30(A).[13] *See also The Methodist Hospitals, Inc. v. Sullivan,* 860 F.Supp. 1309 (N.D.Ind.1994) (holding that § 30(A) is enforceable under § 1983); *Sobky v. Smoley,* 855 F.Supp. 1123 (E.D.Cal.1994) (adopting Eighth Circuit's holding, enforcing § 30(A) under § 1983); *Pennsylvania Association of Home Health Agencies v. Snider,* 826 F.Supp. 948 (E.D.Pa.1993) (holding that home health providers have an enforceable right under § 1983—although erroneously concluding that § 30(A) was part of the Bor-

9. Suter dealt with the provision of the Adoption Assistance and Child Welfare Act, 42 U.S.C. § 620–628, 670–679a, which required state plans for foster care and adoption services to provide "reasonable efforts" to prevent the removal of a child from his home prior to foster care placement, or to make it possible for a child to return to his home.

10. See *Evelyn V. v. Kings County Hosp. Center,* 819 F.Supp. 183, 192 (E.D.N.Y.1993).

11. The Suter majority's analysis of the Boren Amendment, and its comparison with the Adoption Act provision, applies directly to section 30(A): As in the instant case, the "reasonable" rate requirement at issue in the Boren Amendment was supplemented by other statutory provisions and regulations that "set forth in some detail the factors to be considered in determining the methods for calculating rates." *Id.* at ——, 112 S.Ct. at 1368. By contrast, "[n]o further statutory guidance is found as to how 'reason-

able' efforts [to maintain a child or return a child to his home] are to be measured." *Id.*

12. The Eighth Circuit noted:

Our analysis in this case is greatly simplified by the Wilder opinion. Although focusing on a different subsection, *Wilder* addressed the same statute facing us in this case. *Suter* urges a careful scrutiny of the exact legislation at issue and *Wilder* has already done that. Furthermore, the equal access provision is very analogous to the Boren Amendment examined in *Wilder,* they are similar not only in function but also in the specific language employed.

*Arkansas Medical Society, Inc., supra* at 525.

13. One can make a similar comparison with the statute at issue in Albiston: What the First Circuit in *Albiston* found distinctive about the AFDC provision, Title IV–D of the Social Security Act, 42 U.S.C. § 601 *et seq.,* applies as well to § 30(A).

en Amendment); *Illinois Hospital Association v. Edgar*, 765 F.Supp. 1343 (N.D.Ill. 1991) (recognizing hospital's enforceable right under § 1983). *But see, Fulkerson v. Commissioner, Maine Department of Human Services*, 802 F.Supp. 529, 534 (D.Me. 1992) (holding that recipients may enforce the Equal Access provisions of § 30(A) under § 1983, while providers may not).

The defendants argue that § 30(A) is significantly different from the statutes found conveying enforceable rights in *Wilder* and *Albiston*. The *Arkansas Medical Society* decision, and others like it, they claim, are not controlling because these courts did not address the issues they raise here. With respect to non-institutional providers, like home health care agencies,[14] they argue that § 30(A), unlike § 13(A) was meant to authorize limits on spending, "not prop up provider rates at any particular level."[15] For the reasons outlined below, the Court adopts the reasoning of *Wilder, Albiston,* and *Arkansas Medical Society.*

### 2. *Applying the Golden State/Suter framework to § 30A*

On the first issue—whether obligations are imposed directly on participating states—the Eighth Circuit found that the Boren Amendment and § 30(A) were indistinguishable. Both are preceded by the same compulsory language—"[a] State plan for medical assistance must ..." 42 U.S. § 1396a(a). Moreover, 42 U.S.C. § 1396c uses mandatory language in directing the Secretary to stop payments if the plan "no longer complies with the provisions of § 1396a of this title," including the requirements of § 30(A). *Arkansas Medical Society Inc., supra* at 526; *Wilder* 496 U.S. at 512, 110 S.Ct. at 2518–19. Cf. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (refusing to infer congressional intent to condition federal funding on compliance). As the Court observed in *Wilder*, the then Secretary of HHS expressed his intention to withhold funds if the state plan did not comply with the statute or if there is "noncompliance in practice." *See* 42 CFR § 430.35 (1989); *Wilder, supra* at p. 512, 110 S.Ct. at 2519. Rather than the threat to withhold approval of a plan that failed to meet certain general requirements, as in *Suter*, the state's obligations here are buttressed by a categorical threat to stop payments if there is no compliance.[16] Finally, both sections, § 13(A) and § 30(A), define the state's obligation *vis a vis* the providers in similar terms. If the Boren Amendment has been found to do so "unambiguously," giving ample notice to the states as to what its obligations are, then so too does § 30(A).[17]

■ The fact that § 30(A) confers discretion on the state is not dispositive. As in *Wilder*, the state's discretion is hedged with an obligation to take certain factors into account in exercising it, factors which can be objectively determined.[18] While a number of

---

**14.** Institutional providers are hospitals and nursing care facilities providing in-patient services. Noninstitutional providers offer in home health services.

**15.** It is the case that the Arkansas Medical Society briefs on appeal did not address this specific argument.

**16.** It does not matter that the language cited here is directed to a federal official, the Secretary of HHS. The issue is the extent to which this language defines the state's obligations in "unambiguous" terms. The message could not be clearer: The provisions quoted deny the Secretary the discretion to approve funds for state provisions that do not comply with the law. See *Arkansas Medical Society, supra* at 5. Whether the Secretary's enforcement responsibilities parallel or supplant those of private parties under § 1983 is a separate question under *Golden State.* Given the ample Medicaid case law on this issue

(*see* n. 20), defendants do not actually press this position. *See* n. 28.

**17.** This analysis is identical to the third component of Golden State, i.e., whether the provision at issue is too vague to create an enforceable right. Under *Suter*, the issue was whether the provision conveyed the state's obligations with enough specificity so that it could make a reasoned choice as to whether to participate in the program. Under *Golden State*, the focus was whether the provision was so ambiguous as to be beyond the competence of the court to enforce.

**18.** As Justice Brennan noted in Wilder, § 13(A) required that the state "in making its findings ... judge the reasonableness of the rates against [an] objective benchmark of an 'efficiently and economically operated facility' providing care in compliance with federal and state standards while at the same time ensuring 'reasonable access' to eligible participants." 496 U.S. at 519. Section § 30(A) imposes comparable obligations.

methodologies may meet the statutory criteria, there are methodologies within the range of statutory discretion and those outside of it.

Likewise, the statute's language is sufficiently clear to meet *Golden State*'s concerns about the court's competence to apply the statutory standards. The court is not substituting its judgment for that of the state agency, but simply determining if the agency action was based upon "a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

■ Finally, the plaintiffs must also demonstrate that they are the intended beneficiaries of the statutory provisions. The Court in *Wilder* concluded that institutional providers were intended beneficiaries of the Boren Amendment because the Amendment concerned their reimbursement. *Wilder, supra* at 510, 110 S.Ct. at 2517–18. Since the Equal Access provision of 30(A) also addresses payment for "care and services" provided by non-institutional providers, the Eighth Circuit concluded that they "are beneficiaries for the same reasons as were the providers in *Wilder*." [19] *Arkansas Medical Society, supra* at 525. This Court agrees.

The legislative history, and the context in which that history was made, supports the conclusion that Congress created obligations directly enforceable on the states, and did so for the benefit of these providers. When the Equal Access language of § 30(A) was adopted in 1989, Congress was not acting on a *tabula rasa*. There was a history of § 1983 enforcement of the Medicaid statute by providers and beneficiaries of which Congress was presumed to be aware.[20] Given this tradition, congressional intent and language must be especially clear to support the conclusion that the Congress intended to treat the provisions applicable to these providers differently than it had other beneficiaries under the Act.

In contrast, throughout the legislative history, one finds language suggesting that

19. The Arkansas court also cited cases holding that Medicaid service providers could enforce compliance with the Medicaid laws. *See Nebraska Health Care Ass'n v. Dunning*, 778 F.2d 1291, 1295 (8th Cir.1985), *cert. denied*, 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *Oklahoma Nursing Home Ass'n v. Demps*, 792 F.Supp. 721, 727 (W.D.Okla.1992).

20. That history weaves together several strands. First, there is a history of beneficiary suits using § 1983 to enforce aspects of the Social Security Act, beginning with Rosado v. Wyman, 397 U.S. 397 (1970) (enforcing the right to a certain level of benefits as determined by the standard of need under 42 U.S.C. § 602(a)(23)) through *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980) (the provision of statutory benefits to recipients is enforceable through § 1983), and more recently *Albiston v. Maine Comm'r of Human Services*, 7 F.3d 258 (1st Cir. 1993) (the right to prompt disbursement of child support entitlements is enforceable under § 1983).

There were provider suits under § 1983 seeking reimbursement for reasonable rates, culminating finally in *Wilder. See Wilder v. Virginia Hospital Assn., supra* at 516 n. 14, 110 S.Ct. 2521 n. 14.

Moreover, various procedural amendments to the Act suggested Congress intended that providers be able to sue in federal court for injunctive relief. In response to several states freezing Medicaid payments to health care providers, Congress amended the Act to require states to waive any Eleventh Amendment immunity from suit for violations of the Act. *See* H.R.Rep. No. 94–1122, p. 4 (1976); 121 Cong.Rec. 42259 (1975). The legislative history of those efforts suggest that Congress believed the waiver necessary because the existing means of enforcement—noncompliance procedures instituted by the Secretary or suits for injunctive relief by providers—were inadequate. *Wilder v. Virginia Hospital Ass'n, supra* at 517, 110 S.Ct. at 2521–22. Because of the opposition generated by statutes requiring that the Secretary withhold Medicaid funds if the State had not executed a waiver of immunity by a given deadline, Congress abandoned the effort. But that repeal was not intended to "be construed as in any way contravening or constraining the rights of the providers of Medicaid services, the State Medicaid agencies, or the Department to seek prospective, injunctive relief in a federal or state judicial forum. Neither should the repeal be interpreted as placing constraints on the rights of the parties involved to seek such prospective, injunctive relief." S.Rep. No. 94–1240, at p. 4; *Wilder, supra* at 518, 110 S.Ct. at 2522.

This history strongly suggests that Congress was never committed to HHS as the primary enforcement arm. Although the opportunity presented itself, Congress never amended the Social Security act to require exclusive HHS enforcement, and shut off private actions. Indeed, the record suggests Congress recognized and approved such actions.

§ 30(A) was intended to confer a benefit on providers. This was particularly the case in 1989 when the Equal Access language, then existing in regulations, 42 C.F.R. 447.204, was included in the statute itself. The House report noted:

> The Committee Bill would codify, with one clarification, the current regulation, 42 C.F.R. 447.204, *requiring* adequate payment levels. Specifically, the Committee bill would *require* that Medicaid payments for all practitioners be sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

H.R.Report No. 101–247, 101st Cong., 1st Sess. 390 (1989), reprinted in U.S.C.C.A.N. 1906, 2116. (Italics supplied.)

Likewise, the regulations governing the implementation of the Equal Access provision of 30(A), 42 C.F.R. 447.200, state that:

> This subpart prescribes State Plan requirements for setting payment rates to implement § 1902(a)(30) of the Act, which *requires* that payments for services be consistent with efficiency, economy and quality of care.

(Italics supplied.)

### 3. That § 30(A) is a Limitation not a Benefit

Defendants argue that § 30(A) is not enforceable because its purpose was to "limit both utilization and reimbursement" rather than to assure provider rates at any given level. Urging the Court to read the Boren Amendment and § 30(A) in tandem, the de-

fendants argue that the Boren Amendment set an affirmative reimbursement standard for hospitals and nursing homes while § 30(A) was enacted to place an upper limit on that spending. If the purpose of § 30(A) was to limit spending for institutional providers, the defendants argue, then it was also meant to limit spending for non-institutional providers. Furthermore, if its purpose is to limit spending, the defendants claim, then § 30(A) can hardly have been intended to confer a benefit on plaintiffs in this case. They outline the following legislative history:

The Boren Amendment was enacted in 1980, Pub.L. 96–499, § 962(a), 94 Stat. 2599, 2650, to govern nursing home reimbursement; the following year, it was extended to cover hospitals. Pub.L. 97–35, § 2173, 95 Stat. 357, 808. The operative language, defendants claim,[21] clearly conferred a benefit on institutional providers. From the outset, § 30(A) was enacted to limit reimbursements. Social Security Amendments of 1967, Pub.L. 90–248, § 237. In 1967, the statute required state plans to:

> [P]rovide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments . . . are not in excess of reasonable charges consistent with efficiency, economy and quality of care.

In fact, in 1981, Congress amended § 30(A) even further, this time eliminating the "reasonable charge" language.[22] Omnibus Budget Reconciliation Act ("OBRA"), Pub.L. 97–35, § 2174.[23] Legislative history suggests that the purpose of § 2174 was to require

---

**21.** By 1982, § 13(A) provided that the state plan must provide:

> . . . for payment . . . of the hospital services . . . through the use of rates . . . which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards, and *to assure that individuals eligible for medical assistance have reasonable access . . . to inpatient hospital services of adequate quality.*

The underlined section was enacted by the Boren Amendment. *Wilder, supra* at 507, 110 S.Ct. at 2516.

**22.** The section then required the state plan to:

> " . . . provide such methods and procedures relating to . . . the payment for [ ] care and services . . . to assure that payments are consistent with efficiency, economy, and quality of care."

**23.** This was done in the same year that Congress extended the Boren Amendment to cover hospitals, under § 2173.

that state reimbursement of non-institutional providers be subject to a ceiling, determined in the aggregate rather than provider by provider.[24]

Defendants' position that § 30(A) is a limitation is unaffected by the addition of the "equal access" language to § 30(A) in the Omnibus Budget Reconciliation Act of 1989. That language, they claim, was driven largely by Congressional concern that, as a result of low reimbursement levels and other reasons, inadequate numbers of physicians, especially obstetricians and pediatricians, may choose not to participate in the program in some areas. *See,* H.Rep. No. 101–247 at 390 (1989). While the defendants concede that this provision "could be said to offer some benefit to providers," it characterizes the provision as one intended to benefit recipients rather than providers. The "test of adequacy," they claim, is not "adequacy in relation to any provider's individual costs or to the costs of a hypothetical efficient provider, but instead the availability of covered services to recipients." Defendant's Memorandum in Support of Motion to Dismiss, p. 13. If a provider could show that the level of reimbursement was too low to assure its continued participation, that would not be actionable if other providers could be enlisted to fill the gap.

The reasoning is flawed. First, it may be said that by 1989, with the enactment of the Equal Access provision, § 30(A) had compound purposes, not unusual for legislation that is the product of compromise. In fact, in this respect, § 30(A) was not unlike the Boren Amendment. The Boren Amendment was also designed to limit the excesses of previous rate setting regimes—and *still* the Court found that it conferred an enforceable right.

■ The Boren Amendment had had two purposes. First, it was a cost containment measure, seeking to replace the previous regime, in which providers were reimbursed for the reasonable cost of services actually provided, which Congress found to be "inherently inflationary." H.R.Rep. No. 158, Vol. 2, 97th Cong., 1st Sess. 279, 293 n. 82 (1981) U.S.Code Cong. & Admin.News 1981, pp. 396, 575, 585.[25] While the "actual cost" regime provided few incentives to reduce inefficiencies in care, it was hoped that the Boren Amendment would lead states to reduce their reimbursement, thereby forcing providers to control costs. *See* Wing, *American Health Policy in the 1980's,* 36 Case W.Res.L.Rev. 608, 641 (1985–86); Colosi, *Wilder v. Virginia Hospital Association, supra* at 140–141. It was also intended to increase state discretion to set the methods and standards by which they would calculate reimbursement rates, and make them responsible for con-

---

**24.** Defendants quote the Senate report as follows:

States, in general, determine the reimbursement rate for services, except for in patient hospital care, where they are required to use Medicare's reasonable cost payment system ... States are required to reimburse skilled nursing facilities and intermediate care facilities at rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities in order to meet applicable laws and quality and safety standards. *Generally, for other services, States may establish their own reimbursement levels, provided the amounts do not exceed what would be allowed under Medicare.*

\* \* \* \* \* \*

Since States would be free under the bill to establish payment rates without reference to Medicare principles of reimbursement, the Secretary would only be expected to compare the aggregate amounts paid to hospitals by

Medicaid in applying this limitation. *A similar aggregate test of reasonableness of Medicaid reimbursement would be applicable to physicians*

Sen.Rep. No. 97–139, at 473, 478 (1981), U.S. Code Cong. & Admin.News 1981, pp. 396, 739, 744. (Italics supplied.)

**25.** Until 1972, the Medicaid Act required states to reimburse providers for the costs they actually incurred. See *Friedman v. Perales,* 668 F.Supp. 216, 222 (S.D.N.Y.1987) aff'd 841 F.2d 47 (2d Cir.1988). Between 1972 and 1980, reimbursement rates were to be determined "on a reasonable cost related basis." 42 U.S.C. § 1396a(a)(13)(E) (1979); Pub.L. 89–97, § 1902(13)(B), 79 Stat. 286, 346. At the same time, even the "reasonable cost standard" appeared to be inflationary. The Boren Amendment was passed to go even further to limit costs, to impose standards met by an "efficiently and economically operated facility." *See,* Colosi, *Wilder v. Virginia Hospital Association,* 12 PACE L.Rev. 139, 140 (1992).

ducting studies on the reasonableness of the rates.[26]

At the same time, Congress, concerned lest the reimbursement levels dip too low, required assurances that quality and safety standards would be complied with, and that Medicaid eligible individuals had "reasonable access" to medical care. Federal regulations were specifically promulgated to require states to provide reimbursement at levels necessary to assure access to medical care by Medicaid recipients. 42 C.F.R. § 447.204. Thus, the language which the Court in *Wilder* and *Suter* found to confer enforceable rights, included language of limitation and state discretion.

Second, the defendants minimize the significance of the Equal Access provision in § 30(A), applicable to both institutional and non-institutional providers. The Court in *Wilder* cited to comparable language in the Boren Amendment [27] as part of its rationale for concluding the Amendment conferred an enforceable right. *Wilder, supra* at 509, 110 S.Ct. at 2517. Indeed, the language in § 30(A) concerning "equal access" is even stronger than the comparable language in the Boren Amendment ("reasonable access"). While Congress may have been especially concerned with the coverage of obstetric and pediatric care, the fact is that they enacted an Equal Access provision to apply to all categories of covered services.

Furthermore, the fact that the Equal Access provision was intended to benefit the recipients, does not mean that it is not also available to benefit the providers. All of the provisions of the statute are intended to benefit recipients by setting provider rates that will be adequate to the task. That fact did not stand in the way of the Court in *Wilder*

or more recently in *The Methodist Hospitals, Inc., supra.* In *The Methodist Hospitals, Inc.,* the district court found that § 30(A)'s Equal Access provision conveyed an affirmative benefit, even as to hospitals, notwithstanding the defendant's claim that it was only intended to cap hospital reimbursements. *See The Methodist Hospitals, supra* at 20.

By the 1989 amendment, § 30(A) functioned relative to non-institutional providers very much like § 13(A) had with respect to institutional providers. It provided for the payment of rates consistent with the same benchmarks, efficiency, economy and quality of care, as in the Boren Amendment, and at a level sufficient to insure equal access. To be sure, there are differences. Nevertheless, the differences between the two are not so substantial as to justify an entirely different interpretation.[28]

### B. *Whether the Complaint Alleges an Actual Controversy with Respect to the Right of Recipients to Access to Services under § 30(A).*

Defendants claim that there is no basis for the allegation that the Equal Access component of § 30(A) has been violated at this time. They contend that plaintiffs speculate about whether the new rates will a) lead to a dearth of home health services, b) force them to drop out of the program because of the decline in the rates, and c) keep other providers from stepping into the breach so as to assure equal access. This is especially the case, they claim, since the new methodology includes a provision for an adjustment to the rate of any provider if necessary to ensure

---

**26.** The main purpose of the Boren Amendment was to increase the state's flexibility and discretion in establishing reimbursement methodologies that promote efficient delivery of services, while maintaining federal oversight at the "minimum necessary to assure proper accountability." *See* S.Rep. No. 139, 97th Cong., 1st Sess. at 478 (1981), reprinted in 1981 U.S.C.C.A.N. 744; H.R.Rep. No. 97–158, Vol. 2, p. 293 (1981).

**27.** That language in the Boren Amendment was: [I]n order to provide care and services in conformity with applicable state and federal laws ... and to assure that individuals eligible for

medical assistance have reasonable access ... to inpatient hospital services of adequate quality.

**28.** Defendants have not directly argued that Congress has implemented an administrative enforcement mechanism that would supplant § 1983 enforcement, the second prong of Golden State. They make the argument indirectly—by arguing that this Court should not direct the state to amend its Medicaid plan until HCFA determines that the existing amendment is inadequate. See section IIIC.

access to adequate care and services.[29] To the extent that the intended beneficiaries of the statute are the recipients, the issue is not ripe since there is no reason to assume that their equal access to services will falter. To the extent that the intended beneficiaries of the provision are the providers, the issue is not ripe since there is no reason to assume that they would not be successful in securing an adjustment for their own rates, and, failing that, be obliged to drop out of the program.

■ The issue is not whether the rates set by the defendants will, in fact, have a particular result, failure of equal access, forcing these providers out of the market without replacements. Rather, the issue is whether the rates set by the defendants conformed to particular criteria—whether they took the Equal Access issue and other statutory standards into consideration. That involves an analysis of the rate setting procedures, an analysis which is ripe for decision. The fact that the plaintiffs can appeal their rates, an appeal in which they would bear the burden of establishing the inappropriateness of the rates, is not relevant to the question of whether the defendants have met their obligations concerning the manner in which the rates were set.[30]

The state setting the rates, and the Secretary of HHS reviewing them, must take certain factors into account—equal access, as well as efficiency, economy and quality of care. As Congress noted in 1989:

The Committee expects that the Secretary, in determining [based on state plan submissions] whether services are available to Medicaid beneficiaries at least to the extent that services are available to the general population, will compare the access of beneficiaries to the access of other individuals in the same geographic area with private or public insurance coverage ...

H.R.Rep. No. 101–247, 101st Cong., 1st Sess. 390 (1989) reprinted in 1989 U.S.C.C.A.N. 1906, 2116.

■ In addition, quite apart from issues concerning the rate setting mechanisms, the issues that the plaintiffs raise concerning the failure of notice and the adequacy of the state's plan are plainly ripe for review. *See, Oregon Ass'n of Homes for the Aging, Inc. v. State Department of Human Resources,* 5 F.3d 1239, 1243 (9th Cir.1993); *Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. 721, 727 (W.D.Okla.1992).

### C. Whether the Plaintiffs' Motion for Summary Judgment applies to both the Superseding and the Interim Rates.

■ Plaintiffs seek to enjoin the implementation of the January 1, 1994 rates and seek a declaratory judgment on the "interim" rates and phase-in rates in effect from July 1, 1993 through December 31, 1993.[31] With respect to the interim and phase-in rates, the defendants argue that the plaintiffs' chal-

**29.** 114.3 CMR 3.07 "The commission shall review and act on a request for a change in rates of payment due to alleged threatened access to service delivery within 60 days after receipt of an application. Providers application must include, without limitation, certification from the Medicaid Division ... that, without an increase in rates, access to services by Medicaid recipients will be jeopardized or that the quality of the service will fall below levels acceptable to the Medicaid Division and required by Title XIX, and information regarding the scope and nature of services threatened."

**30.** Other courts have agreed that providers have the right to challenge rate setting methodologies, both institutional and non institutional providers (without expressly addressing the issue of standing). *See, The Methodist Hospitals, Inc. v. Sullivan, supra; Pennsylvania Home Health Agencies v. Snider,* 826 F.Supp. 948 (E.D.Pa.1993); *Ohio*

*Hospital Association v. Ohio Department of Human Services,* 62 Ohio St. 3d 97, 579 N.E.2d 695 (1991); *Orthopaedic Hospital et al v. Kizer,* 1992 WL 345652 (C.D.Cal.1992) 1992 U.S.Dist. LEXIS 21123 (C.D.Cal.1992); *Illinois Hospital Ass'n v. Edgar,* 765 F.Supp. 1343 (N.D.Ill.1991). Two federal district courts have entertained provider suits without addressing enforceability or standing. *Clark v. Kizer,* 758 F.Supp. 572 (E.D.Cal. 1990) modified, 967 F.2d 585 (9th Cir.1992); *Pennsylvania Ass'n of Home Health Agencies v. Snider,* 826 F.Supp. 948 (E.D.Pa.1993). *Cf. Mary Washington v. Fisher,* 635 F.Supp. 891, 902 (E.D.Va.1985), *Kansas Health Care Assoc. v. Kansas Department of Social and Rehabilitation Services,* 958 F.2d 1018, 1022–23 (10th Cir.1992) (no standing because whether the reimbursement policy is illegal depends on facts specific to each nursing home.)

**31.** See section IIIB, *infra.*

lenge does not satisfy the case or controversy requirements of Article III. Regardless of whether the RSC failed to file a state plan amendment prior to implementing the interim and phase-in rates, the subsequent adoption of new rates removes any "vitality appropriate for resolution ... of the legal questions presented." Defendants' Opposition to Plaintiffs Motion for Summary Judgment at p. 12 (quoting *Massachusetts Hospital Association v. Harris*, 500 F.Supp. 1270, 1280 (D.Mass.1980).

The *Harris* case does not apply here. In *Harris* the plaintiffs challenged interim rates which had been adopted without filing the appropriate state plan amendment, while the new rates had met all applicable requirements. When the court held that it lacked jurisdiction to review the adoption and implementation of the new rates (on grounds not relevant here), it concluded that a declaration as to the superseded rates would have no effect other than to provide the plaintiff with compensation in a subsequent state proceeding (an end-run around the 11th Amendment).

■■■■ In the instant case, the Court has denied the defendants' motion to dismiss the complaint. If the Court also rules for the plaintiffs on their summary judgment claims, and enjoins the implementation of the new rates, the interim rates will replace them. *See, e.g. Mason Gen. Hosp. v. Secretary of Dept. of H.H.S.*, 809 F.2d 1220, 1223 (6th Cir.1987); *New England Memorial Hospital v. Rate Setting Commission*, 394 Mass. 296, 304, 475 N.E.2d 740 (1985). Since the interim rates are presumably subject to the very same challenges, they do possess, in the words of the court in *Harris*, enough "vitality appropriate for resolution" to satisfy Article III. *Harris, supra* at 1279. *See, Arkansas Medical Society v. Reynolds, supra* at 529 (holding that the "defendant's burden is a heavy one" "when attempting to demonstrate that there is no reasonable expectation that the wrong will be repeated.") *See also, Southern Pacific v. ICC*, 219 U.S. 498, 514–

515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911) (allowing a challenge to an Interstate Commerce Commission order that had expired because such order should not be defeated "as they might be, by short term orders, capable of repetition, yet evading review."); *Firefighter's Local v. Stotts*, 467 U.S. 561, 568, 104 S.Ct. 2576, 2582, 81 L.Ed.2d 483 (1984) (finding a claim for back pay adequate to keep the case from being moot); and *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974) (finding that so long as the federal court's decision is likely to have some effect in the future, the case should not be dismissed even though the plaintiff's primary injury has passed).[32]

## III. CROSS MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A. Framework for Analysis.

Plaintiffs have moved for partial summary judgment on the question of whether the Commonwealth has satisfied the requirement that it submit an amendment to the state plan in the event of "[m]aterial changes in state law, organization or policy, or in the state's operation of the Medicaid program" (42 C.F.R. § 430.12), and provide "public notice of any significant proposed change in [the state's] methods and standards for setting payment rates for services." (42 C.F.R. § 447.205(a)). The Commonwealth has moved for partial summary judgment on the same issues.

Summary judgment should be granted where all of the relevant pleadings, viewed in a light most favorable to the non moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Aponte–Santiago v. Lopez Rivera*, 957 F.2d 40, 41 (1st Cir.1992); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990); *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990).

---

32. The Court also denies the defendants' claim that the complaint should be dismissed for failure to comply with Rule 8, Fed.R.Civ.P. The instant complaint deals with complex issues. The requirements of the Rule must be read with a view to the subject matter of the action. Under the circumstances, the Court finds that the complaint was adequate to meet the requirements of Rule 8.

### B. *Factual Setting.*

On the plaintiffs' motion for partial summary judgment, the following statutory framework is undisputed:

1. The Medicaid program is a cooperative federal/state program designed to enable the states to furnish medical assistance to eligible low income individuals. The program is jointly financed by the state and federal governments pursuant to the Medicaid Act, but is administered by the state. The agency presently responsible for administering the program is the defendant, DMA. The defendant RSC is responsible for establishing the rates to be paid to the providers of Medicaid services, subject to review by the DMA.

2. While participation in the program is voluntary, once having elected to participate the state must abide by certain statutory requirements. Under 42 C.F.R. § 430.10, it must submit a state Medicaid plan to the federal Health Care Financing Administration (HCFA) which meets the standards of 42 U.S.C. § 1396a(a). Section 1396a specifies 58 requirements which a state plan must satisfy in order to be approved by HCFA, including section 30(a). Regulations further specify the details with which the plan must be described. 42 C.F.R. § 430.10; 42 C.F.R. § 447.201(b).

3. In the event of a change in the Medicaid program, defined as a "[m]aterial change[ ] in state law, organization or policy, or in the state's operation of the Medicaid program," the state has two responsibilities, one directed to HCFA and the other to the public. With respect to HCFA, the state must submit a plan amendment to enable HCFA to determine if the plan continues to meet the requirements of the statute and regulations. With respect to the public, the state is obliged under 42 C.F.R. § 447.205(a) to provide "public notice of any significant

proposed change in its methods and standards for setting payment rates for services."

4. Prior to the implementation of the new class rates in January, 1994, the state covered both bases, submitting a plan amendment, as far as the class rates are concerned, and giving formal notice.[33] There is no issue concerning the fact of notice, or the fact of a plan amendment. The only issue of dispute between the parties is whether the state's submissions and notice were adequate.

The following facts concerning issues of notice and the plan amendment are either undisputed, or to the extent there is a dispute, that dispute is resolved in the defendants' favor (for purposes of analyzing plaintiffs' motions). These facts are either taken directly from the defendants' affidavits or, they refer to materials in the plaintiffs' affidavits which the defendants have not challenged.

5. Pre–October, 1991:

The regime prior to October 1, 1991 is spelled out in 114.3 CMR § 3.00 (effective July 1, 1990). During that period of time, the Commonwealth reimbursed each home health agency for Medicaid services based on that agency's costs for its most recent fiscal year,[34] adjusted for inflation and subject to certain caps and productivity incentives (the "provider cost rate reimbursement" system). The result was an elaborate system which set unique rates per agency across the Commonwealth for the five service categories, based largely on their actual costs.[35] Affidavit of Paul A. McNulty, ¶ 7 (hereinafter "McNulty Affidavit"); Affidavit of Susan T. Nicholson (hereinafter "Nicholson Affidavit") ¶ 2, Exhibit A.

6. The July 1991—June 30, 1993 (the Interim Rate System):

At a public hearing on July 23, 1991, the RSC announced its intention to establish a class rate system at some point in the future.

---

**33.** This is not the case with respect to the interim rates and phase-in rates. It appears that as to these the state gave notice in a fashion, but never sought to amend the state plan. We address these issues in Section IV, *infra*.

**34.** This figure was taken from the cost figure reflected on the agency's cost report prepared in connection with its participation in the Medicare

old age assistance program established under title XVIII of the Social Security Act, 42 U.S.C. § 1395 et *seq*.

**35.** The service categories were skilled nursing, occupational therapy, physical therapy, speech therapy and home health aids services.

The class rate system was to establish a single rate for each service category for all providers. It was to be based on a "composite of costs an efficient provider would expect to pay for all components within such service." Nicholson Affidavit, Exhibit B, pp. 8–9. Its purpose was to contain costs more efficiently than the provider cost rate reimbursement regime had done.[36]

Between that date and January 1, 1994, the RSC implemented a series of measures to phase in the new system by melding the previous approach, which allowed latitude for the different costs among agencies, with more extensive caps, until the class rate system could be fully implemented. The interim rate regime effected in July 1, 1991 "continued to be based on each provider's agency's reported costs with tightened rate caps and an added rate relief provision to insure access and quality of care." McNulty Affidavit, ¶ 8. On June 21, 1991, notice of public hearing was sent to all providers describing the changes. The notice consisted of the following:

> The proposed amendments will: 1) change the effective date to July 1, 1991 and replace all other pertinent dates in respect to that date; 2) limit rates to the weighted mean in the respective HSAs; 3) change the inflation factor to 1.040 for 18 months and 2.2 for 12 months; 4) eliminate productivity incentives; 5) add a provision to ensure that access and/or quality is not adversely affected by the above amendments.

Nicholson Affidavit, ¶ 2, Exhibit C. Regulations implementing interim rates were adopted by the Commission. McNulty Affidavit, ¶ 8, Exhibit B.

**36.** At the hearing, Paul McNulty, policy analyst in the Bureau of Ambulatory Care testified as follows: "An agency able to provide services at costs below the class rate will be reimbursed the class rate and profit accordingly. This method will also create incentives for those agencies with higher costs to reduce them to a level below the class rate." Nicholson Affidavit, Exhibit B, p. 9.

**37.** The defendants argue that the phase-in rates were not technically class rates, since they allowed variations from provider to provider. Home health rates continued to be based on each provider agency's reported costs, among other

7. July 1, 1993—December 31, 1993, Phase–In Rates; January 1, 1994 Class Rates:

A notice of public hearing was filed on September 11, 1992 announcing that new regulations implementing the class rates were being proposed that would "change the structure of the reimbursement methodology." (Nicholson Affidavit ¶ 2, Exhibit F.) The Notice described the new system as follows:

> Establishing new criteria for administrative adjustments; eliminating, among other things, cost beyond agency adjustments, one time transitional adjustments and appeals section of the regulation.

Nicholson Affidavit, Exhibit F. (114.3 CMR § 3.00) New regulations implementing the changes were published. The regulation's summary noted:

> The amendments change the effective date of the regulation. Some definitions have been deleted, changes have been made in reimbursement as follows: Present reimbursement system in effect until·June 30, 1993. From July 1, 1993 through December 31, 1993, a phase-in reimbursement methodology will take effect. On January 1, 1994, a class rate system of reimbursement will be implemented.

Nicholson Affidavit, Exhibit H. The proposed regulation itself (issued on May 21, 1993) reaffirmed that there would be two sets of rates: 1) rates applicable during a six month phase-in period extending from July 1, 1993 to December 31, 1993 (§ 3.04(2) and (3), the so called "phase-in" rates; [37] and, 2) rates applicable to the period following January 1, 1994 (§ 3.04(4)). Nicholson Affidavit, Exhibit H.[38]

things. McNulty Affidavit ¶ 9. Nicholson Affidavit, Exhibit H. They were amalgams: During the phase-in period an agency whose rate as calculated under the methodology in effect in 1992 falls below the proposed class rates is reimbursed at that rate plus half the difference between the class rate and the calculated rate. An agency whose rate as calculated under the 1992 methodology is permitted to exceed the class rate up to a specified upper limit cap.

**38.** The regulation states:

8. The Plan Amendment:

The State submitted only one amendment to the State Medicaid plan on the issue of rates during the period from 1991 to 1994. The March 8, 1994 amendment, pertaining only to the January 1, 1994 class rates, stated:

f. Home health care services—fixed fee schedules established by the Rate Setting Commission.

Affidavit of Sharon Gillis (hereinafter "Gillis Affidavit") ¶ 6 with attachment.

## C. *Whether the State has Violated the State Plan Amendment Requirements.*

 The regulations require that the plan must "contain all information necessary for HCFA to determine whether the plan can be approved as a basis for Federal financial participation (FFP) in the state program" and more particularly that it must "describe the policy and methods to be used in setting payment rates in each type of service included in the state's Medicaid program" including home health services. 42 CFR § 430.10, 447.201(b). Given the detail of the statute, listing the 58 components of the state plan and specifying the kinds of factors which must be taken into account in setting rates (i.e. economy, efficiency, equal access, etc), and the admonitions of the regulations, it follows that the plan amendment must provide some detail as to whether the statutory standards have been met. Plainly, it did not.

 In a footnote, the state argues that the defendants lack the standing to enforce this aspect of the plan. Under the Supreme Court's analysis in *Suter*, they argue, these are programmatic rights, comparable to the rights the *Suter* court described as a "requirement .. to ensure .. that the state have a plan approved by the secretary which contains the [criteria listed in the Adoption Act]." *Suter, supra* at ——, 112 S.Ct. at 1367. Unlike the Adoption Act at issue in *Suter*, the right here is the right to have rates set according to certain specific standards and criteria. In addition, that right is integrally related to the right to have those standards and methodologies spelled out in the state plan, and reviewed by the appropriate authorities, a built-in procedure to ensure compliance with the statutory criteria. Likewise the Boren Amendment was not simply the right to rates at a particular level but the rates "that the state finds, and make[s] assurances satisfactory to the secretary" are reasonable and adequate to meet the costs of "efficiently and economically operated facilities." *Wilder, supra* at 501, 110 S.Ct. at 2514.[39] The right to a rate set according to certain procedures, including certain review procedures in the state plan, was part and parcel of the substantive right sustained in *Wilder* and *Suter*. In analogous cases, a number of courts have held that the right to have the advice and input of a medical care advisory committee under 42 U.S.C. § 1396a(a)(4) is a right enforceable under § 1983 and not simply "programmatic." *See,* e.g., *The Methodist Hospitals, Inc. v. Sullivan,* 860 F.Supp. 1309 (N.D.Ind.1994). In *Oklahoma Nursing Home Ass'n. v. Demps,* 792 F.Supp. 721, 727 (W.D.Okla.1992), for example, the court stated that the statute, as defined and implemented by the regulation [the regulation dealing with medical care advisory committees] is an integral part of the plaintiff's enforceable, procedural right to have Medicaid reimbursement rates accompanied by findings and assurances of reasonableness and adequacy. *See also, Morabito v. Blum,* 528 F.Supp. 252, 266 (S.D.N.Y.

(4) Rates of payment from January 1, 1994. Rates of payment for all eligible providers effective January 1, 1994 shall be the lower of: (a) the provider's usual charge to the general public; or (b) the schedule of allowable rates set forth in 114.3 C.M.R. 3.04(4)(b).

| Service Code | Allowable Rates | Service | Service Unit |
|---|---|---|---|
| | $55.76 | Nursing Service | per visit |
| | $18.59 | Nursing Office visit | per visit |

| | | |
|---|---|---|
| $55.85 | Physical Therapy | per visit |
| $59.60 | Speech Therapy | per visit |
| $58.22 | Occupational Therapy | per visit |
| $18.70 | Home Health Aide Services | per hour |

39. The fact that the Boren Amendment refers to the making of certain assurances by the state, and § 30(A) does not, is not dispositive. The plaintiffs are entitled to rates according to certain standards and by means of certain detailed procedures set out in the statute and regulation.

1981); *Becker v. Toia,* 439 F.Supp. 324, 333 (S.D.N.Y.1977).

■ Second, the government suggests that the issue of the adequacy of the state plan should be left to HCFA to judge in the first instance. The First Circuit in *Albiston* held that, with respect to compliance with the requirement to prompt disbursement of child support entitlements, the state and Secretary of HHS had parallel obligations. Simply because the secretary also had responsibility to review the plan did not mean that that responsibility was incompatible with the state's separate compliance obligations. *Albiston v. Maine Commissioner of Human Services,* 7 F.3d at 265 ("... [T]he Secretary's oversight responsibilities are neither incompatible with, nor exclusive of, Congress' imposition upon the participating State of the direct responsibility for fulfilling its plan obligations to the statute's intended beneficiaries.") *See also, Rosado v. Wyman,* 397 U.S. 397, 420, 90 S.Ct. 1207, 1221–22, 25 L.Ed.2d 442 (1970) (holding Secretary's authority to withhold funds under § 604 does not preclude private actions to enforce individual rights under Title IV–A of the Social Security Act); *Lynch v. Dukakis,* 719 F.2d 504, 511–512 (1st Cir.1983). The touchstone in *Albiston* was the extent to which the provision imposed a specific obligation directly on the State.[40] Like the Boren Amendment, and the provision at issue in *Albiston,* § 30(A) did so.[41]

Finally, the government suggests, that whatever flaws in the state plan amendment relating to the January 1, 1994 rates do not apply to the interim and phase-in rates. The government argues that there was no need to amend the plan since these rate systems, like the pre-June 1991 system, provided for individual cost related rates for home health providers, subject to certain ceilings on reasonable costs. The question is a close one. There is no doubt that these rates were way stations en route to the implementation of the new class rate system which the defendants concede required an amendment to the state plan. At the same time, plaintiffs claim they effected significant reductions in the reimbursement to the plaintiff agencies. In *Oregon Ass'n. of Homes for the Aging, Inc. v. State Department of Human Resources,* 5 F.3d 1239 (9th Cir.1993) the court held that the obligation to amend the state plan was triggered by "[a] law that effects a change in payment methods or standards," including one that resulted in "different payment rates," reducing, rather than delaying reimbursement. *Id.* at 1241. *See also, Wisconsin Hospital Association v. Reivitz,* 820 F.2d 863, 869 (7th Cir.1987); *AMISUB (PSL), Inc. v. State of Colorado Department of Social Services,* 879 F.2d 789, 794 (10th Cir. 1989), rev. denied 496 U.S. 935, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990) ("change in payment rates under the state plan requires the state Medicaid agency to submit the plan amendment to HCFA for approval."); *North Carolina Department of Human Resources v. U.S. Department of Health and Human Services,* 999 F.2d 767, 769–770 (4th Cir.1993) (Powell, Associate Justice (sitting by designation)).

At this juncture, the Court declines to rule on the question of whether the interim rates and/or phase-in rates triggered the obligation to amend the state plan, without further briefing.

---

**40.** As the court noted in Albiston, *Wilder* suggests that in certain situations an administrative enforcement scheme that imposes clear obligations on the state "may even support the finding of a private right." *Albiston,* 7 F.3d at 269 (quoting *Wilder,* "[i]f the Secretary is entitled to reject a state plan upon concluding that a State's assurances of compliance are unsatisfactory ... a State is on notice ... [of] the concomitant obligation [to beneficiaries] to adopt reasonable and adequate rates." 496 U.S. at 514–515, 110 S.Ct. at 2520.).

**41.** In effect, the state's position is a variant of the second prong of *Golden State,* the argument that enforcement through HCFA preempts enforcement through private actions under section 1983. As to this issue, the state has the burden of proof. The Supreme Court has underscored the fact that it would not "lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federal secured right," *Wright,* 479 U.S. at 423, 107 S.Ct. at 770. The state is obliged to demonstrate "by express provision or other specific evidence from the statute itself," *Id* congressional intent to preclude private enforcement actions. It has not done so. *See e.g.* note 19 *supra.*

### D. *Whether the State has Violated the Notice Requirement.*

42 CFR § 447.205(a) provides for notice whenever there is a "significant proposed change in the [state's] methods and standards for setting payment rates for services." Section (d) specifies, among other things, that the notice must appear in i) a state register similar to the federal register and ii) a newspaper of wide circulation in each city with a population of 50,000 or more. At each stage, the state published its proposed regulations in the CMR and gave notice of its public hearings in the appropriate newspapers—the interim rates, the phase-in rates, and the final class rates. The question is whether these formal notices were adequate to meet the requirements of the regulations.

The regulations specify what the notice must contain, including 1) the "proposed change in methods and standards," and 2) an explanation of "why the agency is changing its methods and standards," 42 C.F.R. § 447.205(c). The plaintiffs challenge the content of the formal notice that the defendants provided. The defendants respond in part by referring to the notice itself but also in part by providing details of the context in which the notice was given:

> Two years of discussions, more than a year of biweekly consultative sessions, a public hearing, numerous telephone calls, correspondence, drafts of the proposed regulation, and finally, the formal published regulation itself.

Defendants' Brief, p. 15. The details are provided in the McNulty Affidavit.

The Court has considerable sympathy for the view that the published notice has to be viewed in a larger setting; namely the actual information communicated from the defendants to the providers, among other interested parties. *Mississippi Hospital Association v. Heckler,* 701 F.2d 511, 520 (5th Cir. 1983); *Michigan Hospital Association v. Department of Social Services,* 555 F.Supp. 675, 679 (E.D.Mich.1983). However, the case law suggests that the Court must look only to the four corners of the formal published notice for compliance with § 447.205(b)(1) and (3). *See, The Methodist Hospitals, Inc., supra* at 15–16.

That inquiry in turn leads to the question of the specificity with which the notice must describe a change in "methods and standards." The public notice regulation, and the statutory sections on which they are based, are part and parcel of the right of health care providers to "reasonable and adequate Medicaid reimbursement rates."

▪ As the court noted in *Oklahoma Nursing Home Ass'n v. Demps,* 792 F.Supp. at 726:

> The applicable sections of the Act, as well as the regulation, are stated in mandatory and not merely precatory terms. The public notice regulation and the statutory sections upon which the regulation is based are essential parts of, and help to implement, the right of health care providers to reasonable and adequate Medicaid reimbursement rates.

Given the specificity of the statute, the standards which it requires rate setting procedures to meet, and the importance the courts have attached to strict compliance with those standards, the notice must give an indication of whether the standards are being complied with—how the new methodology will meet the statutory criteria. *See, Jennings v. Alexander,* 518 F.Supp. 877, 889–890 (M.D.Tenn. 1981).

▪ Looking first to notice of the January 1994 class rates, no provider or recipient reviewing the Commonwealth's formal notice—the notice of proposed regulations in the CMR, the notice of public hearing in the newspapers—would be able to determine if the new rates are likely to comply with the provisions of the statute, specifically the Equal Access and quality provisions. To be sure, most of the cases cited by the plaintiffs deal with situations in which there was a total absence of statutory notice. Only one case, not cited by the parties as it was decided after oral argument, addresses the issue of adequacy of notice. In *The Methodist Hospitals, Inc. v. Sullivan, supra* the court approved notice that provided the methods and standards to be used to formulate the state's new reimbursement methodology in considerably more detail than in the instant case. While it is difficult to compare the

notices by any objective measure, the most that can be said is that a provider reviewing the notice in *The Methodist Hospitals, Inc.,* would be in a far better situation than the plaintiff providers reviewing the notice of the January 1994 rates to determine whether the statutory standards were followed.

The defendant replies that had the plaintiffs attended the myriad meetings and conferences they would have understood, that, in effect, they received constructive notice of the "methods and standards" regardless of the formal notification. That may well be. Nevertheless, there is no way for the Court to make that determination as a matter of fact based on this record. All that is clear from this record is that the formal notice of the January 1994 rates did not accomplish the statutory objective and that the regulation requires that it do so.

Again the adequacy of notice of the interim and phase-in rates is a closer question which the Court will defer until that issue can be more fully briefed by the parties.

## IV. *CONCLUSION*

The Court DENIES Defendants' motion to dismiss. The Court GRANTS Plaintiffs' motions for partial summary judgment with respect to the class rates effective on January 1, 1994, and declares that 114.3 CMR § 3.00 (as revised July 1, 1993) is invalid as it applies to those rates. The Court STAYS that judgment, (1) pending a determination of how quickly state compliance can be effected, and (2) pending briefing and resolution of questions concerning the appropriate interim rates.